at all. Thank you. Good afternoon. May it please the Court. My name is Michael S. Kasanoff. I am co-counsel for the appellants. To my left is James Butera. We will be splitting up the argument. I will be addressing qualified immunity and the miscellaneous issues. He will be addressing specific to the hospital's liability. There is a principle from the Second Circuit that guides us in this case. Specifically, the Court cannot grant deference to the executive when the exercise of emergency powers infringes upon constitutional rights. Further, there is a duty to conduct a serious examination into the necessity of a public health measure that infringes upon constitutional rights. Also, there is a distinction between letting patients die and making patients die. Those are guiding principles. Now, this case was basically dismissed on grounds of qualified immunity. We respectfully submit that that was premature. This was a 12B6 motion. There were questions of material fact. The recent Walker case from July of this summer specifically addresses that when there are questions of material fact, summary judgment is inapplicable. The standard is even higher on a 12B6. Interestingly, we're not coming here looking to win the case. We're one of the few litigants that appear in front of this Court. We're not looking to win the case today. What we are looking to do is being given a chance to compete. Well, it's not a fact question whether there is a such clearly established constitutional law that was violated. That's a legal question, is it not? Well, clearly established comes down to a legal question, Your Honor. But then there are fact questions that affect that analysis, especially when it includes fundamental rights. We're submitting that when there's an infringement upon fundamental rights, there's a duty to take a very serious look at the conduct that occurred. So, yes, qualified immunity is a question of law. But when there are fact questions surrounding that question of law, it is general law to defer and allow the parties to develop discovery and decide those issues later at a later stage of the case. Can I ask a question about your sort of theory of the case? I understand the theory about defendants having political reasons to want to facilitate transferring patients out of the hospitals. What I don't understand is what your theory is as to why the defendants would have wanted to funnel those patients back into nursing homes rather than the other alternatives that you identify. What's the sort of bad faith reason that you're sort of ascribing to the defendants for doing that? Or are you? Maybe you're not. Yes, we are. We're alleging deliberate indifference. They knew what happened in Kirkland, Washington. They knew that it was completely unworkable. Do you have a theory about why they did it anyway? Was it just stupidity or was it... I mean, that's, I guess, what I'm getting at. That's one of the reasons why we need discovery, to dig under the hood. You're not alleging, but you're not alleging... You have alleged that the motivation to try to facilitate exiting patients from the hospital, you've alleged a sort of theory of motivation there. But you haven't necessarily alleged a theory of a motivation as to why the method of doing that would be to send them back to nursing homes or require nursing homes to take them rather than more aggressively open up these alternatives. Is that right? Well, our position is that it never had to happen. There were plentiful alternatives. They knew in advance. You had the hospital shift. You had the Javits Center. And you don't have a theory about why they didn't pick those alternatives? Well, our theory... Alleged theory. Alleged theory. Again, my colleague will probably address that further because he's going to address the issue with the hospitals. But it's not that we necessarily have to allege something nefarious, per se, on their... Like, I'm not going to allege that they... Yeah, we're going to intentionally cause death to the state's elderly people. We are alleging that they knew better. They knew better. And further, under CMS guidelines, they didn't follow CMS guidelines. And that's a big issue lately in the media. The CMS guidelines provided that... First of all, the CMS guidelines were permissive versus mandatory. These directives were mandatory. They had to take the patients and they could not test for COVID. But the CMS guidelines, and this is the key here, specifically said if the nursing homes were capable of basically segregating the patients and absorbing all those patients. Now, we know as a practical matter, the nursing homes throughout the state are mostly, I'm going to use a slang term, but it's mostly, quote, unquote, mom and pop shops. It was almost impossible to enforce, to put this directive in place and have a good outcome. They had the alternative. No one had to die. Yet it happened. And they should know better. They should be held to a standard. At a fair minimum, we should be able to look under the hood, look at the emails, look at what happened, look at the underlying things that happened, what went into it. And then at some point, we come back in front of another court after there's been a full development of the factual record. And then we decide whether there is a dismissal on qualified immunity, rather than the premature dismissal before we could even get going. What do you think your strongest case is? If you had to pick one case that you think most strongly signals to all the parties involved that the conduct you alleged violates a clearly established right. Okay. Well, again, from the fundamental rights perspective, it's the Agudith Israel case demanding fundamental rights. But from qualified immunity, of course, it's the classic Hope v. Pelser, which says that you do not have to have a case directly on point. And qualified immunity does not have to be interpreted so narrowly. I would also add that. It has to be clearly established enough to put officials on notice in March 2020, not in hindsight, but in real time. Correct. That what they were doing violated clearly established constitutional rights.  So what is the best of... Agudith was after COVID. I mean, it was after the events in question here. Correct. But it dealt with analysis of fundamental rights. And fundamental rights pre-existed COVID. Fundamental rights go back to the founding of the country. The jurisprudence interpreting these rights under the Constitution. And also, let's get into the Federal Nursing Home Act. The Federal Nursing Home Act has been law since 1987. As cited in our brief... But the Supreme Court didn't decide until three years later that there was even an implied right of action under that law. That is correct, in the sense, but that doesn't mean that the rights weren't... Even if there's no private right of action, that doesn't mean the rights don't exist. That those rights, those rights under the Federal Nursing Home Act have been established since 1987. And law cited in our brief says that the statute can give rise to rights, federal rights that rise to a level of a right that's within the Constitution. So even if there was no federal right of action, that doesn't excuse someone, a government official, from not being aware and protecting those rights, even if you couldn't sue over it. So the fact that Tversky happened afterward does not defeat the Federal Nursing Home Act aspect of the case. I see that I have my red light on. Thank you. We'll hear from Mr. Katerina. And I reserve four minutes for rebuttal at the end after everyone else. Thank you, Your Honor. Thank you. May it please the court, James Butera, here also on behalf of the appellants. As my colleague mentioned, we're going to, in this part of our presentation, focus on the hospital defendants. And I want to start first with this document, which is at the core. This is the March 25th, 2020 document with the transfer of the hospital patients with COVID over to the nursing homes. And I'm also going to address, Your Honor, the question of the why to the nursing homes before I finish, I hope. So this is a document that says New York Department of Health, Andrew Cuomo's name on it, Howard Zucker's name on it. And that would ordinarily imply to someone reading it that this was the work product of the New York State Department of Health. But we're going to show that that was not the case at all. This was the work product of the hospital defendants. Now, why do we say that? And our complaint alleges this in paragraph 59 early on. So here is Dr. Zucker asked a question under oath for the U.S. Congressional Committee looking into this. And the question is, when did you first see a copy of the directive? And his response is, quoting now Dr. Zucker, so I actually do not remember seeing this advisory. Now, that is a startling statement. The director of health, the person most in charge under Governor Cuomo for the health policy in the midst of this crisis, says, I don't remember seeing that document. And he goes on to say, I was there along with the others from the governor's office when the decision was made to issue the advisory. Now, let's turn to the former governor himself, also under oath before the U.S. Congress. In a transcribed interview, Mr. Cuomo testified that he played no role in the issuance of the March 25 directive. And this is the directive for which, as my colleague has said, thousands of people with COVID were transferred to the home of the elderly and the disabled. They're disabled as a category if they're in a nursing home. And he said, I was not even aware of this when he was asked about it at a press conference on April 21, almost one month later. Ms. DeRosa also told, under oath, the following. In a transcribed interview, Ms. DeRosa testified that she played no role in the development of the March 25 directive and also only learned about it at a press conference when a reporter asked about it. Here's a contemporaneous account. Cuomo didn't know coronavirus patients were being sent back to nursing homes. How is that possible? How could the Department of Health never see the directive before it's issued? And how could the governor and the chief of staff not see the document? So how does all of this show that the hospital defendants were acting under color of state law? I beg your pardon, sir? How does all of what you're discussing right now show that the hospital defendants were acting under color of state law? I'm not coming, sir, to that. So here's how it happened. They drafted this proposal. The document that I just read that carries the names of the Department of Health was actually drafted by the hospital defendants. Now, how do we know that? Well, there's actually two critical documents in the course of this COVID-19 crisis. One was the legislature giving immunity to the medical field, and the other was the March 25th, 2020. So here is what Kenneth Hrasky, the president of the Greater New York Health, said. We had to report to the CEOs of all the associations that we drafted and aggressively lobbied for the legislation that will protect you from any case brought for our practice under the COVID-19 crisis. So we read that, and we said, well, perhaps they did the same. Indeed, we asserted they did the same. And in the course of the five years that we have been working on this, no one has ever said that the hospital defendants did not draft that document. And, Your Honor, coming to your precise point, what is the legal implication of that? Well, under the state actor doctrine, it is one thing to jointly cooperate with the public officials. It's another thing altogether if you are allowing them to do everything and that they are not exercising an independent action on their own. Now, how could the Department of Health possibly have exercised independent judgment when they were not even aware until the time it was issued and they were not even aware of the contents after it was issued? And so the state actor doctrine comes into play because this is not even a question of their doing this together. This is delegating the power of the state to private parties, thereby making them, we would respectfully suggest, Your Honor, the state actors in the creation of the document which led to the early death of thousands of New Yorkers. And what's your best case for that proposition? And were the Dennis case involving bribery of public officials? We do not have to go that far, Your Honor, and we're not suggesting that at all. We are saying that with dereliction of duty on the part of the New York state hierarchy, the people who took the voters' trust were sworn into duty to uphold their interests. And they delegated this authority completely to private sector parties. And here's just a couple of other things that the private sector parties have said in response to our allegation about their conduct. They said, Well, the First Amendment protects us from our public advocacy, the right to petition the government for action. And it doesn't matter. I'm reading this directly from their brief. No matter how harmful their incidental impact may be on third parties. They go further to defend their conduct by saying, We are permitted to request a government action that benefits our own interest, even if it allegedly taken for purposes of benefiting the finances of their member organizations, which we most certainly allege. And in this capacity, Your Honor, here is some of the research that we did with respect to how the transfer from the hospitals to the nursing home works for the financial benefit of the hospitals. First, they're collecting automatically 20 percent more because it's a COVID patient. And they've moved everybody else out to put the COVID patients into the hospitals. They would have gotten that benefit if they had transferred them to the ship that was waiting or the Javits Center or anywhere else, wouldn't they have? You didn't allege a financial benefit associated with sending them to the nursing homes in particular. Yes. Well, this is a quote from an article that we found. And I can't pretend, and this is why we need expert testimony, this is why we need to get to the next stage of this litigation. But they said that the discharge from the hospital to another hospital or to the patient's home does not have the same remuneration as it would have if they go to a nursing home. So getting back then to where we are, Your Honor, the most crucial factor. They're not allowed, they're not allowed to deputize private parties to 100 percent to administer the functions of the state. That's what they did in this situation. In addition, Your Honor, we would say that in and of itself amounts to a shock to the conscious standard. As it would trigger the 14th Amendment and the right to the preservation of persons and of course the right to the preservation of life. Thank you, counsel. We'll hear from the attorneys. May it please the Court. I'm Rita Glavin and I represent former New York State Governor. Andrew Cuomo. The issue before this Court is whether two advisories, March 25th and April 7th of 2020, which set forth some standards for the transfer of patients from hospitals, patients who no longer needed to be hospitalized, to the return of nursing homes in the face of a once-in-a-century infectious disease public health emergency and in the face, and it's in the plaintiff's complaint, of the reality that the New York State public hospital, the New York State hospital system at that time may have faced collapse, is whether those two advisories setting forth some standards for the transfer violated any clearly established right. That is a defense as a matter of law. Well, once they set some standards, they also had some prohibitions, right? Yes. Correct, Your Honor. You can't require a COVID test. Correct, Your Honor. So that's not a standard. That's something, I mean, that's clearly designed to ensure that the recipient nursing homes don't have the ability to decline to accept patients who put the rest of their population at risk. Your Honor, there were two standards that were set forth, and one is that discharge patients, okay, they could not be refused admissions based, and this is important, solely on a suspected or positive case. In other words, the nursing home believed that you had had COVID while you were in the hospital. That's what you were being treated for. You could not be refused for that sole reason. That's the first. You could be refused for other reasons. There's no prohibition. If the nursing home says, we don't have the staff for this patient, we don't have the ability to care for this patient, that is not prohibited. The second part of it, and it's the next sentence, which is they cannot be refused, or you cannot require a test. They cannot be refused because you don't have a test. That is a policy decision made at a specific time during the COVID crisis, which was in, you know, we're now in March 25th of 2020. We're a few weeks in, as everyone remembers, at that period of time. And the question is, one, I think, I mean, we get into the facts. I don't think you need to on whether this is a clearly established right. But the reality is, A, whether you had the tests, B, the reliability of the tests, and what type of tests that you had. When you are faced, when a public official is faced at that period of time with the potential of the hospitals not being able to care for the most acutely ill COVID patients, and to have them in, and you're going to have lines out of hospitals, choices were made. So let me ask, I totally hear what you're saying. One of the things I'm struggling with is we're on a 12B6. Right. So we're taking the complaint and things you can infer. And there is a reference in the complaint to the notion that there was pressure from the hospital association to help folks clear out. But it wasn't sort of an elaborate explication of all of these considerations. And one of the things I'm trying to figure out, and maybe you can help me with, is we all lived this, and we all have perceptions of memories of the chaos and confusion in the early days, and perceptions maybe even of what might have been happening. To what extent can we entertain our own instincts around that, or even your explanations about that, other than what's alleged specifically in the complaint? You don't have to, Your Honor. I think there are many things that you can take judicial notice of, because there have been a lot of decisions talking about this public health emergency. But I think when you ask, well, there are these, you know, facts, you may dispute the facts. Of course, Governor Cuomo disputes the facts that there was some, you know, corrupt motive here. But I think it is instructive to look at two cases in this circuit on qualified immunity. One was the panel. You were on the July 17, 2025 decision, NRA versus VULO. And you actually asked, Your Honor, a very similar question about, you know, should there be discovery on this particular issue? Why do you get qualified immunity at this stage? And it's because the argument here is, was there any violation of a right? And was it such that every reasonable official, and this is right from the VULO language on qualified immunity, it's at page 389, whether every reasonable official would have understood that this was some violation of law at the time. So the requirement of no test, okay, for readmission, or saying you can't deny solely, because this person who has now been determined to be medically stable, they've recovered from COVID, that they can go back to the nursing homes, because a physician has to certify them under that March 25, 2020 advisory. Has to certify that they're stable, not that they're not contagious. Not that they're not contagious, but the idea of if you're going to open up the hospitals for the acutely ill, those are for the most serious people. To be medically stable, I think there's just a common definition that you're not getting worse, that you are no longer an acutely ill patient. So here's the allegation, though. Yes. First of all, the allegation is there were other places to send those folks. Yes. And that defendants, and this is inconsistent with the description you're giving me, but defendants knew the directives were unworkable, knew that most nursing homes are not equipped to handle airborne, highly contagious, and deadly virus, that the directives were without any medical or scientific basis, that insufficient infection controls, PPE, COVID testing, staff training, et cetera, in the facilities, thereby putting patients at risk. So the allegation is that even though defendants knew all these things, and even though they had another place to send folks, they issued these directives. Is that something that a reasonable policymaker would think, if those allegations were true, was not unlawful? Two things about it. One is that the allegations, there is a whole litany of they knew it is violated the Administrative Procedures Act. They knew that they didn't have the staff. They knew X, Y, and Z. Remember, the allegations have to be well pled. And these allegations and a list of them are quite conclusory. The complaint itself, with respect to these three particular plaintiffs, alleges no specific allegations with respect to the facilities that they were at and that they are pointing to. Okay? I think that's important. Number two, with respect to they knew, they knew. In the NRA case, well, we'll use Lombardi v. Whitman, which is another qualified immunity case. And the allegations in that case, which were assumed to be true, were that the head of the EPA, Christine Todd Whitman, knowingly lied about the conditions of what was happening at the 9-11 horror site and that people went down there. And so the idea of, well — That's what state created that danger of the 9-11. State created, yes. And there was a finding that there was, you know, it was not a violation, that it did not rise to a level of a violation of substantive due process, and so qualified immunity applied. I think that is instructive here. But also on NRA v. Vulo — But the language of that case suggests that it could apply here. No, I think — State created danger is that if the state action allows a third party to introduce a danger to victims, then that is something that is well established. There's two reasons why. One, it's not just any danger. Where the state created danger doctrine has been applied by this circuit and in the precedent is when you have a third party, such as a police officer, hands to a robbery victim a gun, and that robbery victim then used the gun to shoot the robber. That's an example of where the state created danger doctrine applied. The state created danger doctrine, when this Court has applied it, there's almost a direct relationship. There wasn't a third party in Lombardi. There wasn't a third party. I don't believe there was a third party in Lombardi. And that's exactly — there was not the type of — I think the language was brutal and egregious to human dignity. With respect to the March 25th advisory, there's no dispute about what the words of that advisory say. So the question is, and I want to go back to NRA versus VULO, because I do think that that is the most recent qualified immunity decision. But the words of the advisory, no one disputes what they say, which is that we're expecting that the hospitals, there's going to be an acute need for hospital beds to be freed up. When we talk about alternatives, Your Honor, as you had asked, what about the ship? What about they could have gone to Javits Center? Even by the math in the complaint, those were only 7,500 hospital beds. And what they were calling for and what they were expecting for, and this was in the advisory issued two days before the March 25th advisories, was they were going to need 100 percent increase in capacity, that the hospitals needed to free up 50 percent of beds. So you're talking about the need for tens of thousands of beds based on the projections. So even if, and look at the complaint, you can take them as true, because the complaint, it's almost schizophrenic. On the one hand, it's saying there's, you know, all these profit motives going on, and my client, which he was not, but my client was in the, you know, the pockets of the hospital lobby. But on the other hand, the complaint acknowledges that there was the severity of this crisis, that there was the need for the hospitals to free up beds for people who were now medically stable and no longer acutely ill. And so the question is, what is to be done? Does the complaint acknowledge that, or does the complaint acknowledge that the administration invoked that concept in the context of issuing? In other words, show me where in the complaint they adopt that as a fact that they're alleging. In paragraph, I think it's 52 of the complaint, what they say is what Ken Rasky says, they use this as this is why the hospitals have the motive, is they're saying they're going to be swamped, we need to free up beds. There's an acknowledgment. So they're quoting the hospital's statement of its motive, not their own assertion of the facts. But I think they're using that as an admission, as part of this goes into the motive, is that they knew they were going to be swamped, they were going to have all these acutely ill patients that they could not care for. I view that allegation in the complaint, so using it as an admission to say this is why they were doing it. And I don't think anyone, you know, disputes seriously as to what the state of affairs was that particular time. And another key point on this, New York wasn't the only one to have adopted this. The state of New Jersey adopted a virtually identical policy. This is discussed. It's DeRosa v. Murphy. And qualified immunity was also deemed to apply there. There have only been three courts that have addressed the issue of this advisory and then the nearly identical one in New Jersey. Here it is this particular case where Judge Darcy Hall found no clearly established right. Judge Fela in the Southern District in Ferrari v. Cuomo found the same. And then the District of New Jersey, where the Governor Murphy adopted a nearly identical, was also found to have qualified immunity. There has not been a case that I have been able to find, Your Honor, where this court or any other court, putting aside the First Amendment context, because that was the Agatha v. Israel case that was a facial challenge to a COVID policy on freedom of religion grounds. But I have not located a case where any federal court has said that a state official's response to the COVID emergency in terms of quarantines, masks, vaccine mandates, business closures, where qualified immunity had been overcome. And I go back to Jacobson. This is a once-in-a-century public health emergency. Jacobson says if it bears no relation. How much work is the COVID context doing for you then? If the allegation, if the theory and the complaint is that the defendants sacrificed the lives, the well-being of residents of nursing homes as collateral damage, however inflammatory that is, if that's the theory, is that even on those alleged facts, is that still okay under qualified immunity because of the COVID context? Your Honor, that is, two things about that, because that is sort of, that is a very loaded question. This is the after-the-fact quarterbacking, saying this is what caused these deaths in nursing homes. And there are studies raging either way about what caused it and whether it was community spread and it was already in the nursing homes. And, in fact, with these particular advisories, you have to look at them on the face and say, would any reasonable government official have known that issuing these two advisories, okay, which were subsequently appealed and repealed on May 10th, but issuing them at that time violated any clearly established right? And I do want to go back to the NRA v. Vullo, because in that case, this Court actually found that Commissioner Vullo's actions were a violation of the First Amendment and actually found that they had adequately pled, although Commissioner Vullo disputed it, a retaliatory purpose behind the actions. But then this Court found that there was no clearly established right that was set forth with particularity such that the official would be on notice that this action was unconstitutional or illegal. And so, again, I go back to the defense is whether there was a clearly established right here. Judge Darcy Hall said that there was not, and they have not cited to one. The Aged Act v. Israel is an opposite, and the FNHRA Act, which my colleague recited on the other side, has no applicability to state elected officials. The FNHRA only applies to nursing home operators that receive Medicaid funding. Ms. Glavin. Yes, Judge Cabranes. Am I right that the complaint asserts that admission and readmission to the nursing homes was limited to recovered patients? It is limited to patients determined by a physician certified to be medically stable. And so medically stable means they are no longer acutely ill requiring hospitalization. And it says in your brief quotes, the passage that says, the data suggests that people admitted from hospitals to nursing homes were most likely not contagious. Yes, Your Honor, that has been the position throughout, and that's what this was aimed at. It is not that you were to send back the acutely ill cases. And that was the whole purpose. You have the advisory says right at the top, we think there's going to be an urgent need for the hospital to be able to care for the acutely ill. And for them to take in the COVID patients that now needed ventilators, were contagious, the most symptomatic, you had people that were in hospital beds that no longer needed hospitalizations but that other facilities were not willing to accept. Thank you, Ms. Clement. Should I go in first? I've absorbed a lot of the questions here. But let's hear next from Mr. Morvillo. Good afternoon. May it please the Court. My name is Gregory Morvillo. I represent Melissa DeRosa in this case. Ms. DeRosa, Your Honors, feels a lot like Admiral Stockdale from the 1992 vice presidential debate when he famously started with, who am I? Why am I here? And the reason is, is because plaintiffs have not alleged personal involvement by Ms. DeRosa in any aspect of this advisory, which they are required to under cases like Shomo v. City of New York. So she is entitled to qualified immunity under either prong one or prong two. The complaint in respect to Ms. DeRosa is not alleged. She is not alleged to have written the advisory, edited it, read it before it was issued, ordered it to be issued, attended meetings where it was discussed, been involved in enforcing it, had communications with a nursing home, a decedent, or any person in the entire world. And her name does not appear on the advisory. The only thing that the complaint says is that she provided, quote, advice, cooperation, and endorsement, and that she administratively issued the advisory. Well, I have no idea what that means, but it is not a well-pled fact in this case. And indeed, the testimony that they quoted from before, that's not even in the complaint. So it is clear what has happened is plaintiffs have dragged Ms. DeRosa into this because she was a high-ranking government official, which is impermissible under cases like Victory v. Pataki or Black v. Hastings on the Hudson Union Free School District, hence the who am I, why am I here argument. Plaintiffs have failed to state a claim against Ms. DeRosa, and it means she is entitled to qualified immunity under prong one. Under prong two, I would go back to the Vullo case myself. First, it states, quote, a right alleged to have been violated is clearly established only if it is sufficiently clear to every reasonable official that the challenged conduct in the specific context of the case violates that right. Vullo notes the general propositions of law or cases decided after the conduct in question cannot be used to demonstrate clearly established rights, and that is all that plaintiffs have in this case. In relation to the FNHRA, plaintiffs rely on Tlefsky to claim that nursing home residents can sue state officials. Well, that's a big stretch because nothing has ever, no court has ever decided or considered under the particular circumstances of this case what the officials faced here, and that is required. It has to be clearly established in the specific context at issue, and it isn't. And by the way, as Your Honor pointed out before, Tlefsky was decided three years after the conduct at issue here. So its holding does nothing to put any defendant on notice in these particular circumstances, and that should dispense with the FNHRA. As to the other allegedly clearly established rights like bodily integrity and so forth, plaintiff has provided nothing involved in the particular circumstances of a COVID-like crisis. They're not even close. Rouleau notes that whether the right was clearly established must be, quote, beyond debate. If the defendants, quote, might not have known for certain, then the right is not clearly established, and it wasn't in this case. And in place of these particular facts they are required to provide, they provide conspiracy theories about various judges and wild factual allegations and comparisons. They resort to comparing convicted criminals in government prisons to nursing home residents. They liken this advisory to handcuffing an inmate to a hitching post, to beating inmates. That's what they do. I don't do it. And what they say is that they don't need to provide similar cases. Well, that's fine because they don't, and they don't because all of those cases go against them. Every court that has looked at this kind of issue has found an upheld qualified immunity, including an unappealed Southern District of New York decision by Judge Failer on virtually identical facts, dismissed for qualified immunity and dismissed for failure to state a claim against Mrs. DeRosa, Governor Cuomo, and Dr. Zucker. Rouleau's analysis is on all fours here. The rights plaintiff espouses as clearly established were not clearly established in this specific context in 2020. Qualified immunity applies, Your Honor. Thank you. Thank you, counsel. May it please the Court. My name is Nelson Boxer of Petrillo, Klein & Boxer, and I represent Dr. Howard Zucker, formerly the commissioner of the New York State Department of Health. I wanted to focus my remarks on the advisory, which Your Honor was asking questions about, and preface it with it by saying that it often, what I heard today, makes it sound like there's a subjective standard at issue here, but it's an objective standard. It's a question of law, and it's one that this Court can affirm that discovery is not necessary. Now, the plaintiffs here, elsewhere, repeatedly accuse the defendants in this case of mandating, of requiring nursing homes to accept patients who had COVID or have COVID. But the advisory had three prerequisites before you even get to the question of testing. The patient had to be medically stable. The discharge planner had to confirm to the nursing home by telephone that the patient was medically stable, and comprehensive discharge instructions had to be provided by the hospital before transporting the patient back to the nursing home. It then says that readmission cannot be denied solely on the basis of a confirmed or suspected diagnosis of COVID, and it, as Your Honor pointed out, it removes testing as a basis for denying admission. And that's it. That's it. Nowhere on here does it say that a suspected patient in a hospital has to be readmitted to a nursing home if he or she had COVID. And I mentioned the objective standard because all these cases we're discussing speak to I'm sorry, I'm just processing the last statement. Okay. Your Honor, you're saying that it doesn't require someone to accept a patient who's COVID positive, period, or if they lack the facilities to care for such person? Well, I think there are other regulations. I'm not sure they're in the record. The second part is required. So if they don't have the facility or the ability to care. But if they do, then they have to take. I mean, there is an allegation, and I hear what you're saying, but I'm wondering if we're getting beyond the complaint into arguing the facts as they were, rather than as alleged, that the nursing home operators didn't feel that they had a choice. They felt that the direction was very clear from the powers that be that they needed to take these folks. And I understand that that's what they say, but the basis for it is not in this advisory. And more importantly for today, they have to show that it was objective that any reasonable person in Dr. Zucker's position would have understood that this was violating a constitutional right. And that's why I think Lombardi is particularly relevant, because we're in a period of rapidly changing information, unprecedented events. They admit in their complaint that the hospitals are about to be beyond capacity. Objectively, this advisory at this moment in time, it cannot be said that it was so clearly unconstitutional in violation of a right. And it can't be said to shock the conscious. And both of those are required. And by saying that, well, in reality, they really were required to take these people or people felt that way, I understand why they do it, but it's not consistent with the law, and I think it's unfair to Dr. Zucker. I just had one other quick comment, unless you have any questions. The testimony of my client that was cited is not in the record. I think it more or less was described accurately, but the follow-up questions, the follow-up explanations, what he meant by what he said when he said those things was omitted. So it's not in the record. It's certainly not part of the objective standard as of March 25, 2020, and it shouldn't be considered. Thank you, counsel. Thank you, Your Honor.  Good afternoon, Your Honor. May it please the Court, my name is Robert Spolzino, and I represent Applebee's Northwell Health and Michael Dowling. Somebody employed by the State of New York issued the advisories. Northwell and Dowling didn't issue them. The complaint doesn't even allege that they did. The complaint alleges three things with respect to Northwell and Dowling, that the advisory was issued at the behest of and with the direct assistance of and urging of those defendants, that they helped write it, and that Dowling attended six meetings with Governor Cuomo in March of 2020. None of those allegations taken together give rise to any inference whatsoever that Northwell or Dowling were state actors. Somebody in the state, and the appellants have argued that it's terrible that the governor didn't take responsibility or the commissioner of health didn't take responsibility. Somebody in the state issued the directive, and that, an exercise of independent judgment to do that, and that defeats any claim that Northwell and Dowling were state actors. The appellants today have not mentioned their conspiracy claim. The complaint clearly does not allege the elements of a conspiracy that are necessary to be pled, and there are no facts that have been pled, as I stated, do not give rise to any inference whatsoever that there was a conspiracy here. If the court has no questions, I will rely on my brief for the rest of the argument. Thank you. Thank you, counsel. May it please the court, good afternoon. My name is Jeremy Creelan. I'm here on behalf of Apelli's Greater New York Hospital Association and its president and CEO, Kenneth Rasky. I will first note that we join and echo fully the arguments made by the state defendants on this appeal, but, of course, the hospital defendants, and by that I mean my clients and also Northwell, the hospital defendants have an additional reason why the district court's dismissal of appellants' claims was entirely appropriate here and should be affirmed, namely, that the hospital defendants are not governmental entities at all. They're private entities, and as such, they are not subject to claims under Section 1983 except under extremely limited circumstances that do not apply here. The law is very clear that holding a private party liable for Section 1983 violations is a high bar. Now, as what do appellants here allege about the hospital defendants and the two advisories at issue in this case? First, before I get to what they do allege, I want to note that they do not allege at all the theory that for the first time was postulated by counsel on appeal, which is that the state somehow delegated authority to the Greater New York Hospital Association and the hospital defendants. That is not part of the complaint. It's not alleged. That appears for the first time today, and that is sort of the – it's beyond a conclusory allegation. It's not even a conclusory allegation. But let me talk about what they do allege. They basically allege – it boils down to two allegations. First, that the advisories were issued at the behest of and with the direct assistance of the hospital defendants, and it's in response to pleading by the hospital defendants. Now, first, at the behest of and the pleading. Well, it's more than that, isn't it? Isn't there a quid pro quo alleged in the complaint? The – yes, Your Honor, and I'll address that. That is in the context of lobbying. Essentially, the allegation is, the theory in the complaint is that they lobbied, that the hospital defendants lobbied for these advisories and that their motive was financial gain. Right? And this is in paragraph 97. Now, first, as Judge Robinson noted, there's an unsensical aspect to that motivation here because the – if the patients were sent to the boat in the harbor, you know, they would not – they would have had the same, you know, financial gain here. But putting that aside, even taking it at face value, the First Amendment protects this activity, this lobbying activity, regardless of the motive. Trade associations are not transformed into state defendants simply because their lobbying is for a personal benefit. I mean, it's – Well, the Venice case said that bribery does do that, right? Bribery, but we're not – there's no allegation of bribery here. There's an allegation of lobbying, and there's an allegation of campaign finance contributions years before in 2019. There's not an allegation of bribery. I mean, that's crystal clear. They're not alleging any kind of bribery here. And these private parties, of course, trade associations not only lobby for things that are in their members' interests and their own interests, but they also draft legislation, they draft advisories, they draft orders. That's the stuff of being a trade association. If that were enough to transform a private party into a state actor for Section 1983 purposes, we'd have a lot more of these cases, but it's not. In cases like Omnipoint in the Northern District, even if a private party or trade association drafted these advisories, that would not be – that would not turn them into state actors for 1983 purposes. That's protected as well it should be by the First Amendment because this is the lifeblood of our democracy. This is how the legislature and government receives the advice and the input from private parties. I think I've exhausted my time, but I will say that nothing in the complaint rises to the level of Dennis or the other three cases that they cite to support a conspiracy theory. Those all involve very detailed allegations, not the conclusory allegations here, of criminal or near criminal conspiracies to harm, you know, the plaintiffs. And there's no allegation here. In fact, I'll finish by saying in oral argument we heard today that they weren't even alleging intent to harm, they just, quote, they knew better. That's their theory is they knew better. That is not nearly enough to support the allegations – I mean, the claims in this case. Thank you. Thank you, Counsel. We'll hear about it. Thank you, Your Honors. I think we should note that oral argument is akin to scores and highlights. I respectfully suggest that we refer back to the briefs. I believe our briefs rebut everything we've heard today. From the other side, again, hitting these points is not some standard. These were mandates. We submitted an affidavit, for instance, from a nursing home operator in the appendix. And they're well-reported that these were mandates, and at least they felt that there was no choice. And I would add that at this stage in the proceeding, their version of the facts don't matter. It's our version of the facts. I want to dispute something controversially. They say, and this is conventional wisdom, this is a once-in-a-century pandemic. That's the conventional wisdom. However, at Appendix 369, we see that they've been planning for the pandemic for years and years and years. So while COVID itself was its own unique situation in terms of maybe a degree, they've been planning for this for a long, long time. So this is not the exigent high-speed chase situation, because there were plans in place going back years. And it's Appendix 369. We didn't attach the whole thing, but the highlights of that. Now, further, when they address the issue, I want to address Appendix 366. On the 13th, there was another issuance from the Department of Health, which basically cut off visitation and things like that. And there was something in 360, again, Appendix 366, which basically says that the patients in the nursing homes were confined to their rooms, essentially do not go to the common areas. So when we argue in our case that this is akin to a prisoner case, we're making an analogy. I admit that's a little creative in a sense. But they essentially, you had a captive audience of the most vulnerable. The Court could take judicial notice that the elderly were the most vulnerable population subject to this virus. Now, on state-created danger, we do, and the Court hit on it, we're alleging that the third party was, in fact, the introduction of the virus itself. Now, on the, they're claiming, an interesting claim was made about the hospital ship, and that was only 7,500 beds. I remind everyone that this is a Rule 8 pleading standard. This is not a Rule 9b pleading standard. We don't have to identify every last, down to the number, available bed. We do put in, it's in the complaint, there were abandoned buildings, we know that there were tent cities set up, and there was the opportunity, again, taking all facts in the light most favorable to us, that there was more than enough capability with government officials exercising reasonable due diligence so as to prevent these deaths. And there is a duty here. Government is placed with the power of life and death with these policies. There has to be some duty in a constitutional sense to, and again, objectively. Let's, I don't want to be subjective. Let's be objective. Objective, if you, that's why, yeah, we put in a complaint. They knew, they knew, they knew. So if they knew all these things objectively, why'd you do it? Why'd you do it? And again, maybe people disagree. But at this stage, that determination should not be made. Now, let's start distinguishing some cases. First of all, the Third Circuit case is my case with Governor Murphy. That's on appeal at the Third Circuit. But all those, the laundry list of COVID cases, none of those dealt really with life and death. So there's a, so then we get back into fundamental rights analysis, that our case is at an extreme level compared to the run-of-the-mill, you can't operate your business type case. It's a higher fundamental right. Jacobson is distinguishable on those grounds. As per Judge, Justice Gorsuch's concurrence, he explains it very eloquently in the Roman Catholic case, where he basically says that Jacobson dealt with a minor infringement upon having a vaccinated, have a person get a vaccination in the midst of a public health emergency it did not involve fundamental rights. And it says it right in Justice Gorsuch's concurrence. Now, on to Voolo. Voolo is distinguishable because in that case, basically they, Voolo granted qualified immunity on remand because a reasonable official would not have known for certain that their conduct was illegal. We respectfully submit that in this case, they knew that their conduct or should have known that their conduct was illegal. Something also that was said that was just plain wrong, the Federal Nursing Home Act prior to Tavelsky was applicable to state and in all its subdivisions. So this is not something new. The Supreme Court in Tavelsky may have pontificated on the issue and spoke about it, but it was existing law under statutes 42 U.S.C. 1396R subsection E.G.H. 42 U.S.C. 1396A.A.28. So that is just wrong. Let me ask you about that. By statute, those duties are described with reference to the duties of the nursing home. And I take your point that regardless of when the private right of action to enforce those rights against the nursing home happened, the rights were there, clearly established. What can we look at in the statute to tell us those rights were clearly established as it relates to the obligations of a regulating entity outside of the nursing homes? Right. And that's why I quote those statutes. The Nursing Home Act is applicable to governmental, in other words, the governmental agencies oversee the nursing homes. Therefore, they have, they're responsible for enforcing the Federal Nursing Home Act. So if the government agency interferes with those rights under the Federal Nursing Home Act, then the government agency should be on the hook for the infringement upon those rights. That's essentially what we're saying. No, I hear you. Okay. So what's the case that would put a government agency on notice, that not only is it responsible for enforcing these regulations, but that it itself is bound to not infringe the rights recognized in those regulations? Okay. I would submit Wolfe v. McDonald's Supreme Court case from 1974, which says that we think a person's liberty is equally protected even when the liberty itself is a statutory creation of the State. So, and it's also the Mitzell case from the Second Circuit, which says that in addition to precedent, we consider the statute's plain language. So that, so in other words, the statute could, if there's not a, what those cases in my interpretation say, that the statute could put you on notice without the case interpreting the statute, because the statute is another alternative of binding law that subjects someone to its dictates. I'd like to now address the defense's favorite case, which is Lombardi. And that obviously is a key impactful case. Lombardi is distinguishable on two grounds. One, Lombardi talks about incrementalism of a State, of State action. And we say in our brief that, in our reply brief, that Lombardi, this case does not involve incrementalism. It does not involve, it's not a random bystander case. Rather, this was something that placed a whole lot of people, plural, in danger. And a very important matter to distinguish Lombardi from this case. Lombardi, the key to that holding, the key, the very key to that holding, was that they had basically a Hobson's choice. There was no good answer for Governor Whitman in that case. Therefore, there's qualified immunity here. If there's anything we've learned today, we are suggesting that they absolutely had alternatives and that they objectively should have pursued those alternatives so as not to cause the loss of life that we saw as a result of these directives. So I will conclude on that point. If there's nothing further. Thank you, counsel. Thank you all. We'll take the case under review. Thank you, Your Honor.